# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-01651-SCT

*DAUWANNA MITCHELL*

*v.*

*TABITHA MOORE, TILLMON BISHOP,
GUARDIAN OF KEVIN EARL MOORE, MINOR
(NECESSARY PARTY)*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/20/2015 |
| TRIAL JUDGE: | HON. EDWARD E. PATTEN, JR. |
| TRIAL COURT ATTORNEYS: | RENEE H. BERRY |
| | JOE ROBERT NORTON, IV |
| | WAYNE DOWDY |
| | DANIEL SHAY MCGREGOR |
| | ROBERT EMMETT FAGAN, JR. |
| | WILLIAM D. BOERNER |
| | BRAD RUSSELL BOERNER |
| COURT FROM WHICH APPEALED: | LINCOLN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | WAYNE DOWDY |
| | DUNBAR DOWDY WATT |
| ATTORNEYS FOR APPELLEE: | WILLIAM D. BOERNER |
| | TABITHA MOORE (PRO SE) |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 11/30/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2016-CA-00177-SCT

*IN THE MATTER OF THE ESTATE OF TRAVIS
LYNN WEEMS, DECEASED: DAUWANNA
MITCHELL*

*v.*

*TILLMON BISHOP, GUARDIAN OF KEVIN EARL*
*MOORE AND ADMINISTRATOR OF ESTATE OF*
*TRAVIS LYNN WEEMS, DECEASED*

DATE OF JUDGMENT:                 01/05/2016
TRIAL JUDGE:                        EDWARD E. PATTEN, JR.
COURT FROM WHICH APPEALED:   LINCOLN COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT:      WAYNE DOWDY
                                       DUNBAR DOWDY WATT
ATTORNEYS FOR APPELLEE:        TABITHA MOORE (PRO SE)
                                       WILLIAM D. BOERNER
NATURE OF THE CASE:              DOMESTIC RELATIONS
DISPOSITION:                        AFFIRMED - 11/30/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.    This appeal arises from a January 2016 order by the Lincoln County Chancery Court adjudicating Kevin Earl Moore, a minor, the heir of Travis Lynn Weems, who died in an automobile accident in July 2014. Dauwanna Mitchell, Weems's mother, appeals from that judgment, claiming it is invalid because Weems was never adjudicated to be Moore's natural father due to a paternity action filed in 2007 that was dismissed and, as Mitchell claims, never reinstated. Mitchell also claims a final judgment entered in February 2011 terminating Weems's parental rights was improperly revised by the chancery court in October 2015 under Rule 60 of the Mississippi Rules of Civil Procedure.

¶2.    Consolidated with this appeal (2015-CA-01651) is another appeal by Mitchell (2016-CA-00177) concerning the chancery court's 2014 judgment granting letters of administration based on an administrative-letters petition filed by Tilmon Bishop, Chancery Clerk of

2

Lincoln County. Summons thereafter were issued to unknown heirs at law and wrongful-death beneficiaries of Weems.

¶3. Both appeals submit the same claims of error, that the chancery court's order adjudicating heirship is invalid because paternity never was adjudicated, and the chancery court erred in revising the February 2011 termination judgment.

¶4. Finding no merit in Mitchell's assignments of error, we affirm the chancery court's judgment adjudicating Kevin Moore the heir of Travis Weems.

## FACTS AND PROCEDURAL HISTORY

### A. Paternity Adjudication and Child-Support Action Against Travis Weems

¶5. On August 7, 2007, the Mississippi Department of Human Services ("DHS") filed a complaint in the Lincoln County Chancery Court against Travis Weems. The complaint sought to determine paternity of a minor child named Kevin Earl Weems, born out of wedlock to Tabitha Moore. The chancery court dismissed the complaint without prejudice on October 14, 2008, due to nonservice of process.

¶6. DHS filed a new complaint on November 6, 2008, again alleging that Travis was Kevin's father. This complaint was filed under the same cause number as the previously dismissed complaint. Travis was served with process on December 7, 2008, and he appeared before the court and signed an agreed order for genetic paternity testing to be performed on in February 2009 to determine paternity. But Travis never submitted to any paternity test.

3

¶7.	On May 19, 2009, the chancery court entered a judgment for support and other relief, stating:

> [Travis] is the parent of [Kevin] and is therefore under a legal duty to provide for [his] support . . . . The defendant[, Travis] refused to submit to genetic testing in this action. Paternity was previously established pursuant to voluntary acknowledgment of [Kevin].

## B.	Termination of Parental Rights Action Against Travis Weems

¶8.	On September 3, 2010, Tabitha Moore filed a petition in the chancery court seeking termination of Travis's parental rights. Travis was served with process and appeared before the court on February 10, 2011, at which time a final hearing was held in the termination matter. The court entered its final judgment on February 25, 2011, terminating Travis's parental rights to Kevin, stating:

> that the parental rights of Travis Lynn Weems of and to Kevin Earl Weems are hereby terminated, *including the rights of inheritance of and from the child* [.]"

(Emphasis added.)

¶9.	On May 29, 2015, Tillmon Bishop (Kevin's state-appointed guardian) filed a motion to revise the chancery court's February 2011 final judgment pursuant to Rule 60(b)(4) and/or (6) of the Mississippi Rules of Civil Procedure. The motion claimed that no relief affecting Kevin's inheritance rights was prayed for, and there was no mention of such rights during the February 2011 termination proceedings. The motion submitted that the February 2011 judgment should be rendered "void as to the child's rights of inheritance as equity demands those rights to remain intact for the benefit of this child unless specifically and intentionally eliminated by the [c]ourt." The motion further submitted that the "finality of the language

4

erroneously included in the Final Judgment is greatly outweighed by the inequality manifested upon the minor child by the [c]ourt, unintentionally terminating the rights of inheritance of the minor child from his natural father." On July 15, 2015, Mitchell filed a response in opposition to the motion filed by Bishop.

¶10.    The chancery court held a hearing on the matter on August 27, 2015.  On October 22, 2015, the chancery court entered an order revising the February 2011 final judgment, finding that the  language was included based on a clerical mistake, arising from an oversight in the chancery court's original decision.  Therefore, it should be struck from the February 2011 final judgment.  The chancery court described the change as follows:

> The change is not made to reflect any change in mind by this Judge, based upon the fact that no relief affecting rights of inheritance was prayed for by the Petitioner or *Guardian Ad Litem*, or included in the Bench Ruling made at the conclusion of the trial. This correction is made solely to correct an Order that failed to accurately reflect this Judge's original decision as manifested by the Transcript of the Bench Ruling, and pursuant to Rule 60(a) of the *Mississippi Rules of Civil Procedure*.

### C.    Administration Action in the Matter of the Estate of Travis Weems

¶11.    Travis Weems died on July 12, 2014, from injuries he sustained when he was a guest passenger in an automobile during an accident.  The Lincoln County Chancery Clerk filed a petition for Letters of Administration on November 3, 2014.  On November 4, 2014, the chancery court entered a judgment granting the petition, and said letters were issued on November 17, 2014. Summons were then issued to Unknown Heirs at Law and Wrongful Death Beneficiaries of Travis in the time and manner required by law.

¶12. On January 5, 2016, an heirship proceeding was held in the chancery court. Tabitha Moore was the only person who appeared before the court, and she provided sworn testimony supporting Kevin's heirship to Travis.

¶13. The chancery court thereafter adjudicated Kevin to be the heir of Travis. The court based its determination on the May 2009 paternity judgment, in which the court found Travis to be Kevin's natural father.

¶14. Mitchell appeals, claiming the January 2016 order is invalid because Travis was never adjudicated Kevin's natural father because the 2007 paternity action was dismissed and never reinstated. Mitchell also claims the chancery court improperly revised, under Rule 60, the court's February 2011 judgment, which had terminated Travis's parental rights and Kevin's right to inherit from Travis.

## DISCUSSION

¶15. This court will not disturb a chancery court's decision unless the chancery court's findings are manifestly wrong; not supported by substantial, credible evidence; or the chancery court has applied an erroneous legal standard. *Norton v. Norton*, 742 So. 2d 126, 128-29 (Miss. 1999). Questions of law are reviewed de novo. *Smith v. Dorsey*, 599 So. 2d 529, 533 (Miss. 1992).

> **I.    Whether the 2009 paternity action, adjudicating Travis to be Kevin's father, is valid.**

¶16. Mitchell contends that, because the first paternity complaint was dismissed, the second complaint was void for lack of jurisdiction. Mitchell's argument is predicated on the belief

6

the two complaints are actually the same single action, as evinced by the fact the same cause number was used for each action.

¶17. The chancery court found no merit in this claim, explaining that it constituted nothing but "form over substance" and noting that Mitchell's counsel even agreed that if these two actions had used separate cause numbers, there would be "zero merit" to this argument.

¶18. We agree. The fact the same cause number was used in both the first and second complaints is of no matter in this case. The record clearly shows that the first paternity complaint was dismissed without prejudice due to insufficient service of process, and a new complaint thereafter properly was instituted by DHS. The dismissal of the first action without prejudice was not a jurisdictional bar to the second action.

¶19. Secondly, as to the chancery court's finding(s) and ruling(s) in the second paternity action, Mississippi Code Section 93-9-21(1)(b) instructs:

> If the putative father does not submit to genetic testing, the court shall, without further notice, on the date and time previously set through the notice for hearing, review the documentation of the refusal to submit to genetic testing and make a determination as to whether the complaint to establish paternity should be granted. The refusal to submit to such testing shall create a rebuttable presumption of an admission to paternity by the putative father.

Miss. Code Ann. §  93-9-21(1)(b) (Rev. 2011).

¶20. The record illustrates that Travis agreed to undergo genetic testing to determine paternity, but he ultimately did not submit to testing. Later, during the proceedings pertaining to the termination of Travis's parental rights, Travis told the chancery court the reason he did not submit to testing was because he could not afford it, and he never actually

believed he was not Kevin's father. Travis stated to the record: "I thought it would be best just to make sure he was mine, just to be straight up and honest."

¶21. The chancery court also found that Weems voluntarily had acknowledged his paternity, as evidenced by his having signed Kevin's birth certificate.

¶22. These factors, according to the chancery court, constituted a presumption of admission by Travis that he was Kevin's father. This presumption was never rebutted by Travis and was actually reaffirmed by Travis at the February 2011 parental-rights termination proceeding.

¶23. For these reasons, we find the chancery court did not err in adjudicating Travis to be the natural father of Kevin. This issue is without merit.

**II.     Whether the Order Terminating Parental Rights was improperly revised.**

¶24. The chancery court found the language "including the rights of inheritance of and from the child" contained in the February 2011 judgment terminating Travis's parental rights constituted a clerical mistake. The court ordered the language struck from the judgment pursuant to Rule 60(a).

¶25. Mitchell argues this was error because the purpose of Rule 60(a) is to correct insubstantial clerical errors. She contends that relief from more substantial errors requires use of Rule 60(b). Specifically, Mitchell points to Rule 60(b)(2), which affords relief based on an accident or mistake, but requires such relief be sought within six months after entry of the judgment. M.R.C.P. 60(b)(2). Mitchell also points to ***Stringfellow v. Stringfellow***, where this Court, in speaking to Rule 60(b)(2), said "neither ignorance nor carelessness on

8

the part of an attorney will provide grounds for relief." ***Stringfellow v. Stringfellow***, 451 So.

2d 219, 221 (Miss. 1984) (citing ***Hoffman v. Celebrezze***, 405 F.2d 833 (8th Cir. 1969)).[1]

¶26.     Motions for relief under Rule 60 in general are addressed to the sound discretion of

the trial court, and appellate review is limited to whether that discretion has been abused.

***R.K. v. J.K.***, 946 So. 2d 764, 776 (Miss. 2007).

¶27.     Rule 60(a) allows the court to correct "clerical mistakes" arising from oversight or

omission for the goal of "mak[ing] the judgment or other document speak the truth."

M.R.C.P. 60(a) cmt. Rule 60(a) reads:

> **Clerical Mistakes**.  Clerical mistakes in judgments, orders, or other parts of
> the record and errors therein arising from oversight or omission may be
> corrected by the court at any time on its own initiative or on the motion of any
> party and after such notice, if any, as the court orders up until the time the
> record is transmitted by the clerk of the trial court to the appellate court and the
> action remains pending therein. Thereafter, such mistakes may be so corrected
> only with leave of the appellate court.

M.R.C.P. 60(a).

¶28.     This Court has explained "Rule 60(a) prescribes an efficient method for correcting

clerical errors appearing in judgments, orders, or other parts of a trial record; errors of a more

substantial nature must be corrected in accordance with MRCP 59(e) or 60(b)." ***Townsend***

***v. Townsend***, 859 So. 2d 370, 375 (Miss. 2003) (quoting former comment to Rule 60(a)).

¶29.     Rule 60(b) provides:

---

[1] ***Stringfellow*** explained that Mississippi Rule 60 is nearly identical to Rule 60 of the
Federal Rules of Civil Procedure, and this Court has at times considered federal
construction(s) regarding Rule 60 to be authoritative when determining what Mississippi's
construction of our rule should be.  ***Stringfellow***, 451 So. 2d at 221.

**Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc**. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1) fraud, misrepresentation, or other misconduct of an adverse party;

(2) accident or mistake;

(3) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;

(6) any other reason justifying relief from the judgment.

The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken.

M.R.C.P 60(b).

¶30. Here, the chancery court found the language contained in the judgment did not reflect the court's original decision, as manifested by the transcript of the bench ruling. The court noted that no request affecting Kevin's inheritance rights was prayed for by Tabitha or the guardian ad litem in the petition to terminate Travis's parental rights. Nor were inheritance rights ever mentioned in the bench ruling stated into the record by the chancery court at the conclusion of the termination proceeding. The court concluded that correcting the February 2011 termination judgment was proper pursuant to Rule 60(a), to accurately reflect the court's original decision.

10

¶31. At the outset, we point out that Section 93-15-109 was repealed by the Legislature when it revised the termination-of-parental-rights chapter in 2016. The disinheritance language found in former Section 93-15-109 was not carried forward into any of the new provisions under the new chapter. The amendments, however, do not have retroactive effect in this case, and former Section 93-15-109 applies. *See* 2016 Miss. Laws, ch. 431, § 24 (H.B. 1240)(2016) ("This act shall take effect and be in force from and after its passage [(approved April 18, 2016)].").

¶32. That said, we agree with Mitchell that the change made here was substantial, and generally, "errors of a more substantial nature are to be corrected in accordance with Rule 60(b)," not Rule 60(a). ***Townsend***, 859 So. 2d at 375. But we also find that the record pertaining to the February 2011 judgment more than substantially supports the chancery court's finding that it did not intend to terminate Kevin's inheritance rights from Travis.

¶33. The question we must answer is: did the chancery court have the authority in this instance to correct what the chancery court found was a mistake on its part? To help us fully consider the matter, we asked the parties for additional briefing to address whether the chancery court should have considered the motion to revise under Rule 60(b)(6).

¶34. Having received the additional briefing from the parties, which has been very helpful in our resolution of the issue, we find that the chancery court did not abuse its discretion in revising the February 2011 judgment to remove the so-called disinheritance language.

¶35. According to the record, counsel for Tabitha drafted the language contained in the February 2011 terminating Travis's parental rights. The May 2015 motion filed by Bishop

11

to correct the judgment contains an affidavit from Tabitha's counsel stating that "the language of said Order was in no way intended to prevent [Kevin] from inheriting from the estate of [Weems]."

¶36. In considering the motion to revise the February 2011 judgment, the chancery court did not speak to counsel's affidavit. Rather, the court, as mentioned, essentially found that inclusion of this language in the final judgment was an oversight by the court.

¶37. Review of the February 2011 termination proceedings suggests that, while not prayed for in the termination petition, there were hopes of an adoption proceeding for Tabitha's new husband at some point in the future. But the chancery court was not agreeable to any such prospect at the time.

¶38. At the conclusion of the February 2011 termination proceeding, after going through the factors justifying the termination of Travis's parental rights, the chancery court stated for the record:

> The court wants to [state for] the record that in the event that this child is adopted, this court will not allow the adoption of the child without a guardian ad litem's report, will not allow the adoption of the child without a complete home study having been done by the Department of Human Services, and the Department of Human Services and the guardian ad litem, if it's not Mr. Norton, being provided with a complete copy of the guardian ad litem's report and the supplement to that report that he's going to file that shows the change in his recommendations and opinions today after the conclusion of the testimony in this case has transpired. In other words, I'm not going to accept a consent adoption on this child because I'm not any too impressed with your husband and the current living arrangements that I've seen and heard in the testimony[. S]o you'll have to convince me that any adoption is in the best interest of the child.

¶39.    As mentioned, at the time relevant to this appeal, Mississippi Code Sections 93-15-101 to 111 governed a termination-of-parental-rights proceeding. Former Section 93-15-109 provided:

> After hearing all the evidence in regard to such petition, if the chancellor, family court judge or county court judge is satisfied by clear and convincing proof that the parent or parents are within the grounds requiring termination of parental rights as set forth in this chapter, then *the court may terminate all the parental rights of the parent or parents regarding the child, and terminate the right of the child to inherit from such parent or parents.* The termination of the parental rights of one (1) parent may be made without the parental rights of the other parent, should circumstances and evidence ever so warrant.

Miss. Code Ann. § 93-15-109 (2000) (emphasis added).

¶40.    This highlighted language is permissive, not mandatory. Were it the latter, it almost certainly would be unconstitutional for reasons expressed by the United States Supreme Court in **Trimble v. Gordon**, 430 U.S. 762, 97 S. Ct. 1459, 52 L. Ed. 2d 31 (1977). In **Trimble**, the Court held that an Illinois law that did not allow illegitimate children to inherit from their natural fathers was unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id*. at 776, 97 S. Ct. 1459.

¶41.    While there is very little Mississippi caselaw regarding the disinheritance language found in former Section 93-15-109, the apparent purpose behind it was to provide courts the authority necessary to terminate such rights where the circumstances of a particular case might warrant it. But there must be some legitimate reason for its application; otherwise it could be applied summarily in any case by mere operation of law, which would run afoul of **Trimble**.

13

¶42. Former Section 93-15-109 also must be read in conjunction with Mississippi Code Section 93-17-13, which this Court consistently has construed as allowing an adoptive child to inherit from both natural and adoptive parents. *See Warren v. Foster*, 450 So. 2d 786, 787 (Miss. 1984) (holding that the right of an adoptive child to inherit from both natural and adoptive parents remains pursuant to Mississippi Code Section 93-17-13). Unlike former Section 93-15-109, there is abundant and clear Mississippi caselaw on this section.

¶43. Many years ago, this Court held that, in the absence of a statute or judgment to the contrary, an adoptive child inherits from both natural and adoptive parents. *See Sledge v. Floyd*, 139 Miss. 398, 407-08, 104 So. 163, 165 (1925) (adoption statute not "intended to deprive children of their rights to inherit from their natural parents and blood relatives"). In *Alack v. Phelps*, 230 So. 2d 789, 793 (Miss. 1970), this Court reiterated that Mississippi's adoption statutes do not terminate the right of the child to inherit from his natural parents. *Alack* explained that its holding was in accordance with the clear intent of the Legislature, stating:

> While the effect of a final decree of adoption is that the natural parent or parents will not inherit by or through the child, and all parental rights are terminated, Mississippi's adoption law does not state in any shape, form or fashion that the right of the child to inherit from its natural parents is terminated. We think the intent of the legislature is clear; they intended for the child to continue to inherit from his or her natural parents.

*Alack*, 230 So. 2d at 792-93 (citing *Sledge*, 139 Miss. at 408, 104 So. at 165; 2 C.J.S. *Adoption of Children* § 63(c) (1936) (in absence of statute to the contrary, adopted child "still inherits from or through his blood relatives, or his natural parents")).

14

¶44. Thus, the public policy in Mississippi remains that adopted children are allowed to inherit from their natural parent(s) in the absence of a court decree to the contrary. This is "to protect minor children from losing their birthright without consent or knowledge." *In re Estate of Yount*, 845 So. 2d 724, 727 (Miss. Ct. App. 2003). To allow otherwise "would raise grave questions where a child having expectations should be adopted against its consent or without its power to consent during the tender years of minority and thus be deprived of benefits." *Sledge*, 139 Miss. at 398, 104 So. at 165.

¶45. Here, there was no legitimate basis or reason whatsoever for terminating Kevin's inheritance rights at the time the February 2011 judgment was entered. Nor, as the chancery court later explained, was such termination requested in the petition for termination of parental rights, or discussed during those proceedings. The chancery court simply failed to catch the language allowing for it in the termination-of-parental-rights order drafted by Tabitha's attorney.

¶46. Though understandable, we think the chancery court's decision to proceed under Rule 60(a) to correct its own error was outside the scope of what Rule 60(a) permits. While arising from an oversight by the chancery court, it was nonetheless a substantial and substantive change, which we think falls under Rule 60(b)'s provisions. Further, it was contended in the May 2015 motion to revise the February 2011 judgment that the chancery court should proceed pursuant to Rule 60(b)(4) and/or (6).

¶47. Mitchell agrees on appeal that the chancery court should have proceeded under Rule 60(b), but she maintains the court was limited by Rule 60(b)(2), along with its six-month time limit, because that provision governs "accident(s) or mistake(s)."

¶48. We agree with Mitchell that what occurred here was essentially a legal error. And legal errors typically fall in the category of "mistake" under Rule 60(b)(2). But a "mistake" also may constitute such a fundamental error that it may be used as the basis of a Rule 60(b)(6) motion, even though it also may fall under Rule 60(b)(2).

¶49. Here, the only person truly affected by the chancery court's error with the February 2011 judgment was Kevin. Mitchell was not a party to those proceedings or that judgment. Kevin was a young minor at the time of the February 2011 termination proceedings, and was still a young minor at the time the May 2015 motion to revise the February 2011 judgment was filed.

¶50. We are reminded what this Court expressed in *Alack*, when explaining why children adopted by others could inherit from a natural parent:

> We have a maxim of equity that also enters the picture[.] When parties are disabled[,] equity will act for them . . . . Children are under the disability of minority and cannot act for themselves[; thus] the equity court will protect their rights.

*Alack*, 230 So. 2d at 792-93 (inner quotations omitted).

¶51. Though Rule 60 was not at issue in *Alack*, the principle iterated there is similar to what Rule 60(b)(6) provides. As this Court has held, Rule 60(b)(6) "is reserved for extraordinary and compelling circumstances." ***Briney v. U.S. Fid. & Guar. Co.***, 714 So. 2d 962, 966 (Miss. 1998). The rule contains a "catch-all" provision, which has been referred

16

to as a "grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses [of Rule 60], or when it is uncertain that one or more of the preceding clauses afford relief." ***Bryant, Inc. v. Walters***, 493 So. 2d 933, 939 (Miss. 1986).

¶52. The dissent would reverse the chancery court's decision to revise the 2011 judgment and would render judgment denying the motion to amend because moving to amend the judgment more than four years later does not constitute a reasonable time. The dissent contends Mitchell is prejudiced by the delay; and there was no good reason for the movant(s)'s failure to take appropriate action sooner. We disagree.

¶53. The dissent, of course, is correct that the finality of judgments is one of the central pillars of our legal system, and that motions under Rule 60(b)(6) must be "made within a reasonable time." As the dissent points out, this Court has said:

> What constitutes a reasonable time must of necessity depend upon the facts in each individual case. The Courts consider whether the party opposing the motion has been prejudiced by the delay in seeking relief and whether the moving party has some good reason for his failure to take appropriate action sooner.

***Tyler v. Auto. Fin. Co., Inc.***, 113 So. 3d 1236, 1238 (Miss. 2013) (quoting ***Briney v. U.S. Fid. & Guar. Co.***, 714 So. 2d 962, 967 (Miss. 1998)). ***Briney*** quotes this rationale from ***Heirs-at-Law & Beneficiaries of Gilbert v. Dresser Industries, Inc.***, 158 F.R.D. 89 (N.D. Miss. 1993), which quotes it from Wright & Miller, Federal Practice & Procedure. *See* 11 Wright & Miller, *Federal Practice & Procedure* 2866 (1973).

17

¶54. But another factor courts take into consideration when making this determination is the hardship to the movant if relief is denied. *Matter of Emergency Beacon Corp. v. Barr*, 666 F.2d 754, 760 (2d Cir. 1981). The actual movant here is Kevin, not his mother Tabitha Moore, whose attorney drew up the termination order on Tabitha's behalf–ostensibly for a future adoption proceeding that never occurred and was not prayed for in the termination proceeding.

¶55. Kevin was represented by a guardian ad litem at the time of the termination proceeding, who, we recognize, signed off on the 2011 termination order drafted by Tabitha's attorney. But for reasons explained in *Alack*, this does not change our view of the case. Because children are under the disability of minority and cannot act for themselves, our chancery courts will act for them to protect their rights. That is what the chancery court did in this instance when it corrected the 2011 judgment to remove the disinheritance language contained in the 2011 judgment, which the court did not intend to decree.

¶56. This is in accord with the same principle long ago held in *Price v. Crone*, 44 Miss. 571 (1871), speaking to the chancery court's duty with respect to litigation involving a guardian and ward.

> It is the duty of the chancellor to protect the rights of minors, whether the proper defense has been made or not. The pro forma answer of the guardian ad litem, "submits the interest of the infant to the care and protection of the court." Nothing is taken for confessed or waived by the minor or her guardian. The court must look to the record and all its parts, to see that a case is made which will warrant a decree to bind and conclude her interest, and of its own motion, give to the minor the benefit of all objections and exceptions, as fully as if specially made in pleading.

*Id*. at 576.

18

¶57. We further point out that no cause of action to determine heirship existed in this case until after Travis's death. This is because, as stated in *Matter of Estate of Kimble*, 447 So. 2d 1278, 1280 (Miss. 1984), "no person is an heir of another living person." *See also Estate of Kidd v. Kidd*, 435 So. 2d 632, 635 (Miss. 1983) (iterating that a cause of action "accrues only when it comes into existence as an enforceable claim; that is, when the right to sue becomes vested").

¶58. In *Kidd*, the putative daughter of Mack Kidd, who died in 1978, petitioned to determine heirship, which the chancery court dismissed after finding the claim barred by Mississippi's then-six-year general statute of limitations under former Mississippi Code Section 15-1-49 (1972). Relying on this Court's decision in *Knight v. Moore*, 396 So. 2d 31 (Miss. 1981), the chancery court found that the daughter (age forty when she petitioned for heirship) was barred because she had six years upon turning twenty-one (the age of majority) to file her claim.

¶59. Reversing the chancery court judgment, *Kidd* first made the point that the daughter's cause was not a paternity action, but an action to determine heirship. *Kidd*, 435 So. 2d at 634. *Kidd* explained that before the United States Supreme Court decided *Trimble*, the daughter had no action under Mississippi's intestate descent laws. *Id*. at 635. And any obligation of a father's estate for certain liabilities had to be commenced during the father's lifetime under former Mississippi Code Section 93-9-13 (1972). *Id*.

¶60. *Kidd* distinguished *Knight*, in which the chancery court had rendered judgment in favor of a putative daughter claiming to be the heir of Walter Knight. Reversing the

chancery court judgment, the ***Knight*** Court held the putative daughter (who was thirty-nine when she filed her claim in 1978) was barred by Mississippi's general, six-year statute of limitations under former Mississippi Code Section 15-1-49 (1972). ***Knight***, 396 So. 2d at 32-35. ***Kidd*** explained that in ***Knight***, when the putative daughter filed her claim, Walter was still alive but he had been declared "mentally dead" and placed in the State Hospital at Whitfield. ***Kidd***, 435 So. 2d at 635 (construing ***Knight***). And because Walter was still physically alive, he could have no heirs. ***Id***.

¶61.    Notably, it must be pointed out that the ***Knight*** Court raised the defense of statue of limitations on its own motion on appeal because Walter's court-appointed guardian had failed to raise the defense below. ***Knight***, 396 So. 2d at 34. ***Knight*** said "[t]he failure of the guardian to interpose these defenses cannot be visited upon the [mental] incompetent." ***Id***. Noting ***Price*** *supra*, ***Knight*** said the same principle applied for minors applies in cases involving guardians of mental incompetents. ***Id***.

¶62.    In applying the limitations defense, ***Knight*** found the putative daughter was well aware from an early age of all the facts and circumstances she had relied upon in claiming that Walter was her natural father. ***Id***. But she "waited, not until the actual death of Walter Knight, but for eighteen years after attaining her majority and until [Walter] was mentally dead, utterly incapable of defending himself and unable to dispose of his property by will or deed." ***Id***. Thus, based upon "the plain and undisputed facts in the record," the putative daughter, according to ***Knight***, had six years after attaining the age of twenty-one to pursue her claim; therefore, she was statutorily barred. ***Id***. at 34-35.

20

¶63.   Returning to *Kidd*, we point out that *Kidd* limited its decision to holding that the putative daughter's claim was not barred by the general six-year statute of limitations, as was the case in *Knight*. *Kidd* did not get into the merits of the heirship claim itself. Rather, *Kidd* simply found that because the cause of action did not come into existence until the putative father's death in 1978, the putative daughter's claim (filed in 1980), was timely–regardless of the putative daughter's age at the time. *Kidd*, 435 So. 2d at 635.

¶64.   *Kidd* reversed the judgment and remanded the case to the chancery court for further proceedings. *Id*. at 636. In doing so, *Kidd* noted that while the case was before it on appeal, Section 91-1-15 had been amended in 1981. *Id*. at 634. *Kidd*, however, did not speak thoroughly to the changes made to this section; rather, it briefly stated that, in amending Section 91-1-15, the Legislature clearly had recognized this right. *Id*. *Kidd* also advised that, because the putative father's death had occurred in July 1978 (a year after *Trimble*), the parties could amend their pleadings below to raise the constitutionality of Section 91-1-15, given *Trimble*. *Id*. at 635-36.

¶65.   A year after *Kidd* was decided, *Kimble* handed down. There, this Court fully recognized the significance of the 1981 changes to Section 91-1-15.

¶66.   In response to *Trimble*'s constitutional mandate, the Legislature enacted broad changes in 1981 to Mississippi's descent law among illegitimates under Section 91-1-15. The Legislature provided illegitimates the right to inherit from their putative fathers, provided one of three requirements was met: (1) the natural parents had participated in a marriage ceremony before the birth of the child; or (2) there had been an adjudication of

21

paternity or legitimacy before the death of the intestate; or (3) there had been an adjudication of paternity after the death of the intestate if the action seeking the adjudication of paternity was filed within one year after the death of the intestate or within ninety (90) days after the first publication of notice to creditors, whichever is less. **Kimble**, 447 So. 2d at 1279.

¶67. **Kimble** explained that after the 1981 amendments, there were complaints that this remedial statute would open the door to potential stale or fraudulent claims. **Id**. at 1283. The Legislature responded again in 1983, making clear its intent and the purpose behind the 1981 remedial amendments via the following preamble:

> WHEREAS, The Mississippi Legislature passed an act amending Section 91-1-15, Mississippi Code of 1972, and other sections of said code pertaining to the rights and claims of illegitimates, during the 1981 Regular Session, said amendment being effective from and after July 1, 1981; and
>
> WHEREAS, Section 91-1-15 was so amended to provide for intestate succession among an illegitimate and the natural father and his kindred with certain limitations, and to afford unto all illegitimate without classification a remedy whereby they could enforce their substantive rights and claims of intestate succession as provided for in said amendment; and
>
> WHEREAS, the Legislature recognized that the decisions and statutes of this state existing prior to said amendment placed an unsurmountable barrier to inheritance by illegitimates when compared to the rights of a legitimate person, and that said decisions and statutes effectively barred an unnecessarily large number of illegitimates from inheritance through their natural father as a result of certain classifications into which the illegitimate may be categorized in violation of equal protection under the law; and
>
> WHEREAS, it now appears that there is confusion as to the legislative intent in amending Section 91-1-15, Mississippi Code of 1972, and said section is now interpreted by some segments of the judiciary to mean that the Legislature did not intend to create a new, separate and distinct remedy for the benefit of all illegitimates without any classification and said amendment as now codified in Section 91-1-15, Mississippi Code of 1972, is interpreted by some segments of the judiciary to be prospective on rather than retrospective and prospective

22

in effect and is interpreted not to have created a new, separate and distinct remedy for the claims of all illegitimates without classification; and

WHEREAS, *the Legislature recognized at the time it was considering said amendment, that by creating said remedy the Legislature was opening the door to the possible litigation of stale or fraudulent claims and that a further effect of bestowing said remedy upon all illegitimates would possibly be to create a certain amount of confusion and uncertainty as to the status of titles to real property; however, the Legislature intended to bestow upon illegitimates a new and additional remedy whereby such illegitimates could maintain their rights of inheritance notwithstanding such interests of the state in preventing stale and fraudulent claims and avoiding uncertainty as to the titles of real property and, accordingly, the Legislature enacted appropriate periods of limitations within which illegitimates could bring their claims*;

NOW, THEREFORE, in order to eliminate any ambiguity in Section 91-1-15, Mississippi Code of 1972, and to conform said section to express the true legislative intent. BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI.

*See id*. at 1280-83 (citing Section 91-1-15, preamble to Chapter 339, Laws, 1983) (emphasis

added).

¶68.    The 1983 amendment also included the following definitions:

(a) "Remedy" means the right of an illegitimate to commence and maintain a judicial proceeding to enforce a claim to inherit property from the estate of the natural mother or father of such illegitimate, said claim having been heretofore prohibited by law, or prohibited by statutes requiring marriage between the natural parents, or restrained, or enjoined by the order of process of any court in this state.

(b) "Claim" means the right to assert a demand on behalf of an illegitimate to inherit property, either personal or real, from the estate of the natural mother or father of such illegitimate.

(c) "Illegitimate" means a person who at the time of his birth was born to natural parents not married to each other and said person was not legitimized by subsequent marriage to said parents or legitimized through a proper judicial proceeding.

(d) "Natural parents" means the biological mother or father of the illegitimate.

*Id*. at 1281 (quoting Miss. Code Ann. § 91-1-15(1) (Supp. 1983)) (emphasis added).

¶69.    In construing the scope of Section 91-1-15's remedial amendments, the *Kimble* Court noted the United States Supreme Court's decision in *Lalli v. Lalli*, 439 U.S. 259, 99 S.Ct. 518, 58 L. Ed. 2d 503 (1978), handed down the year after *Trimble*. *Kimble*, 447 So. 2d at 1279. *Lalli* upheld a New York statute which required an adjudication of paternity prior to the death of the father. *Lalli* found the New York statute constitutional because it had a rational relation to the state's interest in providing for just and orderly disposition of property after death. *Id*.

¶70.    Observing this, *Kimble* provided:

> It should be noted that our [new] statute is much greater in scope than that approved by the Supreme Court in *Lalli*. Our statute permits an adjudication of paternity after the intestates' death whereas the New York statute did not. *This is but one of the many indications that our legislature intended that the remedies by [Section] 91-1-15 be broadly interpreted. The preamble to the 1983 amendment, quoted in full in this opinion, is also indicative of this point*.

*Id*. at 1279, n.1 (emphasis added).

¶71.    *Kimble* said that "[p]erhaps the most significant aspect of this remedial statute is the fact that it created a remedy in favor of *all* illegitimates regardless of the date of death of the intestate" by placing a three-year savings period in the 1981 enactment, set forth by Section 91-1-15(3)(d)(ii) as follows:

> A remedy is hereby created in favor of all illegitimates having any claim existing prior to July 1, 1981, concerning the estate of an intestate whose death occurred prior to such date by or on behalf of an illegitimate or an alleged illegitimate child to inherit from or through its natural father and any claim by a natural father to inherit from or through an illegitimate child shall be brought

24

within three (3) years from and after July 1, 1981, and such time period shall run notwithstanding the minority of a child.

*Id*.

¶72. To put this into perspective, we briefly relate the circumstances in ***Kimble***. There, Earl Kimble died in May 1980 and his estate was opened in June 1980 and closed in October 1980. *Id*. at 1278. His widow Mable Kimble was appointed administratix of the estate, and all the property therein was distributed to her. *Id*. In 1981, Darlene Larsen, claiming her mother was Earl's illegitimate daughter (who died in 1976), petitioned the chancery court to reopen the estate and to determine her heirship. *Id*. The chancery court dismissed both petitions on the merits. *Id*.

¶73. ***Kimble*** reversed, finding that, based on the 1981 remedial amendments to Section 91-1-15, Larsen could sue to determine her heirship descending from her putative grandfather through her deceased mother. *Id*. at 1283. Larsen's claim was timely asserted, given the three-year savings period included in the new statute. *Id*. at 1281-82. ***Kimble*** explained this was the case for two reasons. *Id*. at 1282. First, throughout the life of Larsen's mother, Earl was alive, and no person is an heir of another living person, thus Larsen's mother had no claim to assert. *Id*. Second, the 1981 amendment did not come into existence until July 1981; therefore no cause of action existed prior to that time. *Id*. at 1282-83. And, although Larsen's mother never had a cause of action, a remedy was created for the first time in favor of Larsen in July 1981. *Id*. at 1282. ***Kimble*** reiterated that "[a] cause of action accrues only when it comes into existence as an enforceable claim; that is, when the right to sue becomes vested." *Id*. (quoting ***Kidd***, 435 So. 2d 632 (Miss.1983)).

25

¶74.   ***Kimble*** concluded its opinion with the following:

> The 1981 amendment and the 1983 clarification thereof clearly eliminated the "unsurmountable" statutory barrier condemned in ***Trimble v. Gordon***, *supra*, while at the same time shortened the limitation period within which to bring a claim and increased the standard of proof to sustain such a claim. In doing so we believe that the amendment in 1981 and clarification amendment in 1983 will effectively afford the illegitimates equal protection of the law, while at the same time accomplish the legitimate state interest of (1) avoiding the litigation of stale or fraudulent claims, (2) the fair and just disposal of an intestate decedent's property; and (3) the repose of titles to real property. Estate of ***Kidd v. Kidd***, *supra*. Justice will thereby prevail wherein all may take comfort, legitimates and illegitimates alike, that they will be treated equally under the laws of the State of Mississippi.

***Id***. at 1283.

¶75.   Here, Kevin was adjudicated Travis's natural son before Travis's death. The chancery court unintentionally terminated Kevin's rights of inheritance from his natural father in a 2011 termination order.  Upon discovering the 2011 judgment, counsel for Mitchell filed a supplemental motion seeking a declaratory judgment that Kevin is not Travis's heir based on the chancery court's 2011 judgment.[2]   Thereafter, Lincoln County Chancery Clerk and court-appointed guardian Bishop (through counsel) petitioned the chancery court on May 29, 2015, to revise the 2011 judgment pursuant to Rule 60(b)(4) and/or (6), claiming the court had unintentionally terminated Kevin's rights of inheritance from his natural father.  The motion cited ***Alack***.  ***Alack***, 230 So. 2d 789.

---

[2] According to the record, Mitchell's attorney discovered the 2011 judgment after having previously filed a motion to dismiss the chancery court's prior decree, which had granted testamentary letters of administrator regarding Travis's estate.  The supplemental motion filed by Mitchell's attorney, seeking a declaratory judgment, was filed approximately nine months after Travis's death.

¶76.   Again, no cause of action for an heirship determination existed until after Travis's death, at which point Mississippi's general statute of limitations period (which is now three years instead of six) began to accrue. *See* Miss. Code Ann. § 15-1-49 (Rev. 2012). Within a year after Travis's death, the chancery court corrected its previous, 2011 judgment (terminating Travis's parental rights), finding that it had terminated Travis's rights of inheritance unintentionally.

¶77.   Under the circumstances of this case, we fail to see how the chancery court's decision unfairly prejudices Mitchell.

¶78.   At the outset, while not asserted in this case, we acknowledge that a plausible contention could be made that, by modifying its 2011 judgment to remove the disinheritance language after Travis's death, the chancery court may have frustrated Travis's wishes. In other words, if the erroneous 2011 judgment had been brought to the chancery court's attention sooner, prior to Travis's death, then Travis conceivably might have elected to dispose of his property by will or deed to exclude Kevin. This is somewhat similar to what had concerned this Court in ***Knight***. *See, e.g.*, ***Knight***, 396 So. 2d at 34 ("Katie Ruth Moore, well aware of all the facts and circumstances on which she now relies, waited, not until the actual death of Walter Knight, but for eighteen years after attaining her majority and until he was mentally dead, utterly incapable of defending himself and unable to dispose of his property by will or deed."). But when fully considered, such reasoning or concern ultimately shows itself to be specious in this case.

¶79. First, we point out that, had the putative daughter in *Knight* brought her claim after the putative father's death, and had she done so after the 1981 remedial amendments to Section 91-1-15, it would have been a different case. Under that scenario, the reasoning expressed in *Knight* would not have been contemplated. Indeed, very likely the same type of concerns expressed in *Knight* were voiced to the Legislature following the 1981 remedial amendments, but were rejected as evinced by the 1983 preamble to this section.

¶80. Second, no contention is made that the chancery court did not intend to terminate Kevin's inheritance rights, or that the 2011 judgment terminating Kevin's rights was not erroneous. Rather, it is contended simply that bringing the error to the chancery court's attention more than four years later does not constitute a reasonable time for purposes of Rule 60(b)(6), and this unfairly prejudices Mitchell. But how so?

¶81. What if Travis had passed away immediately after the 2011 judgment was entered, and the chancery court had been petitioned under Rule 60(b)(2), within six months, to correct its judgment based on "accident or mistake." Were that the case, Mitchell would still stand in the same posture as she does here now, which is the posture of every other intestate family member upon under the changes made to Mississippi's descent law among illegitimates under Section 91-1-15 in 1981.

¶82. Since this state's inception, children's inheritance rights have dominated those of an intestate's parents. And the Legislature fully recognized those rights in 1981 for illegitimate children, creating a cause of action for them under certain conditions that "at the same time" accomplish legitimate state interests. *Kimble*, 447 So. 2d at 1283.

¶83. The disinheritance language contained in the 2011 judgment should have given pause to any reasonable person who paid attention to it, based on Mississippi law (from longstanding precedent to contemporary statutes). And any such person would have had a duty to remedy that uncertainty, which could have been done here in a number of ways. But that duty cannot be put upon Kevin in this instance, who was a young minor in 2011 and in 2014. *Alack*, 230 So. 2d 789; *Price*, 44 Miss. 571.

¶84. In our opinion, substantial justice requires granting relief here under Rule 60(b)(6). Former Section 93-15-109's disinheritance language did not belong in the February 2011 judgment based on the chancery court's findings.

## CONCLUSION

¶85. For these reasons, we affirm the chancery court's January 2016 order adjudicating Kevin the heir of Travis.

¶86. **AFFIRMED.**

**RANDOLPH AND KITCHENS, P.JJ., KING, MAXWELL AND ISHEE, JJ., CONCUR. CHAMBERLIN, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J.**

**WALLER, CHIEF JUSTICE, DISSENTING:**

¶87. Finality of judgments is one of the central pillars of our legal system. As we observed in ***William Iselin and Co., Inc. v. Delta Auction and Real Estate Co***., 433 So. 2d 911, 913 (Miss. 1983), this Court adheres to the "important policy favoring finality of judgments and the expeditious termination of litigation." *See also **Payton v. State***, 897 So. 2d 921, 955

29

(Miss. 2003) ("Public policy requires a finality to litigation."). Under these circumstances, the order entered in February 2011 should remain final; therefore, I respectfully dissent.

¶88.    On February 25, 2011, the Chancery Court of Lincoln County terminated the parental rights of Travis Weems as to Kevin Moore. The order also terminated "the rights of inheritance of and from the child." Four years and three months later, Tillmon Bishop moved to amend the order by striking the phrase terminating the inheritance rights. According to Bishop, Tabitha Moore never sought any relief affecting the inheritance rights of Kevin, so the phrase mistakenly was added to the order. On October 25, 2015, the chancery court granted Bishop's motion under Mississippi Rule of Civil Procedure 60(a), which allows a trial court to correct "clerical mistakes." *See* Miss. R. Civ. P. 60(a).

¶89.    The majority correctly observes this Court's holding that "errors of a more substantial nature are to be amended in accordance with Rule 60(b)," not Rule 60(a). ***Townsend v. Townsend***, 859 So. 2d 370, 375 (Miss. 2003) (quoting former comment to Rule 60(a)). According to the United States Fifth Circuit Court of Appeals,[3] "the relevant test for the applicability of Rule 60(a) is whether the change affects substantive rights of the parties and is therefore beyond the scope of Rule 60(a) . . . ." ***Matter of W. Texas Mktg. Corp.***, 12 F.3d 497, 504 (5th Cir. 1994). In other words, "errors that affect substantial rights of parties are outside the scope of Rule 60(a)." ***In re Galiardi***, 745 F.2d 335, 337 (5th Cir. 1984) (citation

---

[3] This Court may look to the federal courts for guidance because our procedural rules are modeled after their federal counterparts. ***Cannon v. Cannon***, 571 So. 2d 976, 978 (Miss. 1990).

omitted). Because inheritance rights are substantial, I agree an alleged error affecting those rights could not be deemed a "clerical mistake" and altered under Rule 60(a).

¶90. Respectfully, Rule 60(b) does not permit an amendment of this order, either. Rule 60(b)(6) provides a catch-all provision, which allows amendments for "any other reason justifying relief." Miss. R. Civ. P. 60(b)(6). The rule does not have a specific time limit like Rule 60(b)(2). *See* Miss. R. Civ. P. 60(b)(2) (relief from a judgment, order or proceeding based on "accident or mistake" may be granted, but "not more than six months after the judgment, order, or proceeding was entered or taken.") However, a motion under Rule 60(b)(6) still must "be made within a reasonable time . . . ." Miss. R. Civ. P. 60(b). Under these circumstances, moving to amend the final judgment more than four years later does not satisfy the requirement of "a reasonable time."

¶91. In *Tyler v. Automotive Finance Company, Inc.*, 113 So. 3d 1236, 1238 (Miss. 2013), a litigant sought to amend his discovery admissions under Rule 60(b). This Court held that the litigant "failed to file the motion within a reasonable time when he waited almost four years and until after a final judgment had been entered to file his motion for relief." *Id.* at 1241. Concerning the "reasonable time" requirement of Rule 60(b)(6), we observed the following rule:

> What constitutes a reasonable time must of necessity depend upon the facts in each individual case. The Courts consider whether the party opposing the motion has been prejudiced by the delay in seeking relief and whether the moving party has some good reason for his failure to take appropriate action sooner.

*Id.* (quoting *Briney v. U.S. Fid. & Guar. Co.*, 714 So. 2d 962, 967 (Miss. 1998)).

¶92. Here, Dauwanna Mitchell is prejudiced by the delay, since the change in the order would affect her inheritance from her son. As to the reason for the moving party's delay, Tabitha Moore and Tillmon Bishop argue only that the motion was "diligently and promptly" filed once Mitchell sought to challenge the heirship proceedings in 2015. The problem, though, is that Moore's attorney prepared the 2011 order, and the guardian ad litem for Kevin reviewed and approved the order. The parties cannot claim now that they were unaware of what was in the order that Moore's counsel prepared. In other words, there is no "good reason for [the non-moving party's] failure to take appropriate action sooner." *Tyler*, 113 So. 3d at 1241. Accordingly, I would hold, as this Court did in *Tyler*, that a delay of more than four years is not a reasonable time under Rule 60(b)(6) to amend the judgment in this case.

¶93. For these reasons, I would reverse the chancellor's amendment of the 2011 order and render judgment denying the motion to amend.

**COLEMAN, J., JOINS THIS OPINION.**

32