# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01758-COA

**SARAH ELIZABETH DOMKE (CHAMPLIN)**                    APPELLANT

**v.**

**ROBERT EDWARD DOMKE III**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 11/26/2018 |
| TRIAL JUDGE: | HON. JOHNNY LEE WILLIAMS |
| COURT FROM WHICH APPEALED: | LAMAR COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | CHASE FORD MORGAN |
| ATTORNEY FOR APPELLEE: | YVETTE LOUISE STELLY |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/20/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Sarah Domke (Champlin) appeals from the judgment of the Lamar County Chancery Court, which modified the custody schedule that she and her ex-husband Robert Domke III had agreed to during their divorce.  On appeal, Sarah asserts that the chancellor erroneously (1) modified child custody; (2) admitted certain witness testimony; (3) failed to find Robert in contempt; (4) failed to award her a monetary judgment and attorney's fees related to her contempt claim; and (5) failed to dismiss Robert's post-trial motion.  Finding no error, we affirm the chancellor's judgment.

## FACTS

¶2. Robert and Sarah married in 2010, and their daughter Julia[1] was born in 2012. The parties divorced in 2017. Pursuant to the agreement incorporated into their divorce judgment, the parties received joint physical and legal custody of Julia. Robert received physical custody of Julia when he was home from his offshore work, and Sarah received custody when Robert was at work. Custody alternated every twenty-one days or, if Robert was no longer employed offshore, every fourteen days. The parties agreed that Robert would receive not only exclusive ownership and possession of the marital home in Lamar County but also full responsibility for the mortgage payments. The parties further agreed to list the marital home for sale within thirty days of the entry of the divorce judgment and to equally divide any profits or losses from the sale.

¶3. For Julia's kindergarten year (the 2017-2018 school year), the parties enrolled her in school in Sumrall, Mississippi, in Lamar County. Shortly after enrolling Julia in kindergarten, both parties remarried. Robert relocated to Kiln, Mississippi, in Hancock County. Sarah initially remained in Hattiesburg, Mississippi, in Lamar County, but by the time of the hearing, she had relocated to Fayetteville, North Carolina. Despite Robert's move to the Mississippi Gulf Coast, the parties continued to alternate physical custody while Sarah lived in Hattiesburg.

¶4. Over the course of the 2017-2018 school year, Julia accumulated more than twenty

---

[1] For privacy purposes, we use a fictitious name for the minor child involved in this matter.

absences. At least once during the school year, Julia's immunization form expired, and the school had to inform the parties that they would need to update the form before Julia could return. By the spring semester, Julia's academic progress began to suffer, and the school determined that she should not be promoted to first grade.

¶5.     On December 4, 2017, the parties sold the former marital home. Eleven days later, on December 15, 2017, Sarah filed a motion for temporary relief as well as a petition for contempt, modification of the divorce judgment, and other related relief. Sarah alleged that the drive from Robert's home in Kiln to Julia's school almost seventy miles away was adversely affecting Julia and that Robert's move to Kiln made the custody schedule untenable. Sarah also asserted that her upcoming relocation would further render the parties' current custody arrangement impracticable. As a result, Sarah contended that a material change in circumstances had occurred and that she should be awarded primary physical custody of Julia. In addition, Sarah asserted that Robert had damaged her credit rating by his failure to timely pay the mortgage on the marital home. Sarah therefore asked the chancellor to hold Robert in contempt and to award her a monetary judgment and attorney's fees.

¶6.     On December 20, 2017, Robert filed his answer and his counterclaim for contempt and modification of custody. Robert acknowledged that he had fallen behind on the mortgage payments due to an inability to pay. He further stated, however, that he had become current on the mortgage payments and that the marital home had been sold prior to Sarah filing her motion. Robert also requested that the chancellor grant him primary physical

3

custody of Julia. Robert asserted that while in Sarah's custody, Julia had fallen drastically behind at school, had accumulated numerous school absences and tardies, and had been exposed to derogatory comments about him. In addition, Robert expressed his concerns about Sarah's out-of-state relocation due to her remarriage and how the move would affect both visitation and Julia's academic progress.

¶7. The chancellor voluntarily appointed a guardian ad litem (GAL) to represent Julia even though neither party had made any allegations of abuse or neglect. The chancellor subsequently held a three-day hearing, which took place on July 17, August 6, and August 9, 2018. During the course of the hearing, the chancellor heard testimony from the following witnesses: Robert; Sarah; Beverly Thigpen (Sarah's mother); Leslie Hall (Thigpen's co-worker); Jennifer Matherne (Julia's kindergarten teacher); Jennifer Bertram (the dean of academics at Julia's school); and the GAL. After considering all the evidence and testimony, the chancellor entered his findings of fact, conclusions of law, and final judgment on August 14, 2018.

¶8. Even though the chancellor found no material change in circumstances that adversely affected Julia, he still provided an analysis of the factors from *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983). These factors include the following:

(1) age, health, and sex of the child;

(2) continuity of care prior to the separation;

(3) parenting skills and the willingness and capacity to provide primary child care;

4

(4)     the employment of the parent and responsibilities of that employment;

(5)     the physical and mental health and age of the parents;

(6)     the emotional ties of parent and child;

(7)     the moral fitness of the parents;

(8)     the home, school, and community record of the child;

(9)     the preference of the child at the age sufficient to express a preference by law;

(10)    the stability of the home environment and employment of each parent; and

(11)    other factors relevant to the parent-child relationship.

*Id.*

¶9.     In analyzing the *Albright* factors, the chancellor concluded that the following factors favored Sarah: (1) Julia's age, health, and sex; and (2) the parents' employment and the responsibilities of that employment. By contrast, the chancellor determined that the following factors favored Robert: (1) parenting skills and the willingness and capacity to provide primary child care; (2) the parents' moral fitness; (3) Julia's home, school, and community record; and (4) the stability of each parent's home environment and employment. Finally, the chancellor found the following factors to be neutral: (1) continuity of care; (2) the parents' physical and mental health and age; (3) the emotional ties of the parents and Julia; and (4) any preference expressed by Julia.

¶10.    The chancellor acknowledged that the GAL had concluded under the *Albright* analysis

that "continuity of care[;] employment[;] employment schedule[;] sibling separation[;] age, sex[,] and health[;] willingness and capacity[;] and stability of the home" favored granting physical custody to Sarah. After briefly discussing his reasons for reaching different conclusions on several of these factors, the chancellor held that neither party had proved a material change in circumstances that adversely affected Julia's welfare. Although Sarah had moved to North Carolina, the chancellor noted her testimony that she planned to move back to Mississippi in the near future. The chancellor concluded that a move alone failed to justify any change in physical custody. As a result, the chancellor denied the parties' requests for modification of child custody and their related claims for child support.

¶11. The chancellor did, however, find that a modification of the parties' custodial schedule was necessary for the upcoming school year. The chancellor provided that Robert would have Julia during the 2018-2019 school year and for two weeks during the summer while Sarah received Julia during the remaining eight weeks of summer and the entirety of Thanksgiving and spring break. The chancellor further directed the parties to divide the time over the Christmas break. In addition, the chancellor denied Sarah's contempt claim against Robert after finding that any damage to Sarah's credit had been unintentional, the marital home had been sold, and the parties had moved on with their lives.

¶12. On August 24, 2018, Sarah filed a motion to alter or amend the chancellor's judgment, to open the judgment and amend the findings of fact and conclusions of law, or, alternatively, for a new trial. On September 24, 2018, Robert responded to Sarah's motion and moved for

6

clarification of the parties' continuing financial obligations regarding certain shared expenses for Julia and for clarification or correction of omitted terms regarding the custody exchange for Julia's long-distance travel between Mississippi and North Carolina. On September 28, 2018, Sarah moved to dismiss Robert's motion. Sarah argued that although Robert had framed his post-trial motion as one seeking clarification under Mississippi Rule of Civil Procedure 60, the motion actually contained new requests for relief and sought to alter or amend the chancellor's judgment. As a result, Sarah contended that Robert's motion was really an untimely filed motion pursuant to Mississippi Rule of Civil Procedure 59(e). She therefore requested that the chancellor dismiss Robert's motion.

¶13. The chancellor held a hearing on October 1, 2018, and then entered his order on the parties' post-trial motions on November 26, 2018. The chancellor granted Robert's requests for more specific terms regarding the custodial schedule and exchange. The chancellor also provided guidance regarding "telephonic visitation and/or electronic face-to-face visitation" with Julia. The chancellor denied all other requested relief. Aggrieved by the chancellor's August 14, 2018 final judgment and November 26, 2018 order, Sarah appeals.

## STANDARD OF REVIEW

¶14. "Our review of domestic[-]relations matters is limited." *Gaddis v. Wilkerson*, 235 So. 3d 1446, 1448 (¶6) (Miss. Ct. App. 2018) (quoting *Chesney v. Chesney*, 849 So. 2d 860, 862 (¶8) (Miss. 2002)). We affirm "a chancellor's findings of fact when supported by substantial evidence unless the chancery court abused its discretion, was manifestly wrong [or] clearly

7

erroneous, or [applied] an erroneous legal standard . . . ." *Hammons v. Hammons*, 289 So. 3d 1214, 1218 (¶13) (Miss. Ct. App. 2020) (quoting *Anderson v. Anderson*, 8 So. 3d 264, 267 (¶7) (Miss. Ct. App. 2009)). We review questions of law de novo. *Id.*

## DISCUSSION

### I. Child Custody

¶15. Sarah first argues that the chancellor erred by awarding "custody" of Julia to Robert. While acknowledging that the chancellor did not explicitly modify child custody, Sarah contends that "the end result" of the chancellor's judgment still amounted to an award of physical custody to Robert while she essentially received visitation. Sarah contends that the chancellor erred because (1) he made no finding that a material change in circumstances had occurred; (2) his decision was contrary to the GAL's recommendation; and (3) he abused his discretion in analyzing the *Albright* factors. Sarah therefore asks this Court to reverse the chancellor's award of "custody" to Robert.

¶16. "To modify child custody, 'the [moving] party must prove: (1) that a substantial change in circumstances has transpired since issuance of the custody decree; (2) that this change adversely affects the child's welfare; and (3) that the child's best interest mandates a change of custody.'" *Heisinger v. Riley*, 243 So. 3d 248, 256 (¶29) (Miss. Ct. App. 2018) (quoting *Strait v. Lorenz*, 155 So. 3d 197, 203 (¶20) (Miss. Ct. App. 2015)). "The party seeking the modification bears the burden of proof by a preponderance of the evidence." *Warner v. Thomas*, 281 So. 3d 216, 222 (¶18) (Miss. Ct. App. 2019).

8

¶17. In analyzing whether a material change of circumstances has occurred, "[t]he chancellor must consider the 'totality of the circumstances.'" *Heisinger*, 243 So. 3d at 256 (¶29) (quoting *Strait*, 155 So. 3d at 203 (¶20)). Where a party proves that "an adverse substantial or material change" has occurred, "the chancellor must then perform an *Albright* analysis to determine whether modification of custody is in the child's best interest." *Id.* "However, if there has been no material, adverse change in circumstances, the *Albright* factors need not be addressed." *Page v. Graves*, 283 So. 3d 269, 275 (¶24) (Miss. Ct. App. 2019) (quoting *Voss v. Doughty*, 242 So. 3d 952, 957 (¶13) (Miss. Ct. App. 2018)).

¶18. "Generally, 'the mere moving of the custodial parent does not constitute a material change in circumstances for child[-]custody modification purposes.'" *Butler v. Mozingo*, 287 So. 3d 980, 983 (¶12) (Miss. Ct. App. 2019) (quoting *Welton v. Westmoreland*, 180 So. 3d 738, 749 (¶34) (Miss. Ct. App. 2015)). "[I]t is the effect the move has on the child and the custody arrangement that is dispositive." *Id.* (quoting *Welton*, 180 So. 3d at 749 (¶34)). For instance, "[t]his Court has found [that] even a short move can result in a material change in circumstances where the move causes the custody agreement to become impractical." *Munday v. McLendon*, 287 So. 3d 303, 310 (¶29) (Miss. Ct. App. 2019) (citing *Robinson v. Brown*, 58 So. 3d 38, 43 (¶14) (Miss. Ct. App. 2011)).

¶19. Here, after taking into consideration all the testimony and evidence presented at the hearing, the chancellor found that the parties had failed to prove any material change in circumstances that warranted modification of child custody. However, the chancellor agreed

9

with the parties' assertions that their two-to-three week alternating custody schedule was no longer practical while Sarah lived in North Carolina. The chancellor noted, though, that Sarah planned to return to Mississippi in the near future, and as the hearing evidence demonstrated, the parties had successfully managed their joint physical-custody arrangement prior to Sarah's relocation, even though almost seventy miles separated them. The chancellor therefore concluded that joint physical custody continued to serve Julia's best interests.

¶20. Upon review, we find that substantial credible evidence supported the chancellor's determination that no material change adverse to Julia had occurred and that joint physical custody continued to serve Julia's best interests. In addition, we find no abuse of discretion or manifest error arising from the chancellor's decision not to modify custody. Although the chancellor discussed the *Albright* factors, we recognize that his finding of no material change in circumstances placed him under no duty to undertake the *Albright* analysis. *Page*, 283 So. 3d at 275 (¶24). We further recognize that although the chancellor was under no obligation to follow the GAL's custody recommendation, he still provided a sufficient explanation as to why he reached a different conclusion than the GAL. *Porter v. Porter*, 23 So. 3d 438, 449 (¶28) (Miss. 2009) ("[T]here is no requirement that the chancellor defer to the findings of the guardian ad litem. Such a rule would intrude on the authority of the chancellor to make findings of fact and to apply the law to those facts." (quoting *S.N.C. v. J.R.D.*, 755 So. 2d 1077, 1082 (¶17) (Miss. 2000))).

¶21. Despite finding no basis for a custody modification, the chancellor acknowledged that

10

a modification of the custodial schedule was necessary for the upcoming school year. This Court has previously recognized that "[j]oint physical custody does not require equal time with each parent, but it does require that the parents have 'significant periods of physical custody to assure a child of frequent and continuing contact with both parents.'" *Gaddis*, 235 So. 3d at 1448-49 (¶7) (quoting Miss. Code Ann. § 93-5-24(5)(c) (Rev. 2013)). We explained in *Gaddis* that "a custody schedule has the characteristics of a visitation schedule[,]" and "[t]o modify a visitation schedule, 'it must be shown that the prior decree for reasonable visitation is not working and that a modification is in the best interest of the child.'" *Id.* at 1449 (¶9) (quoting *H.L.S. v. R.S.R.*, 949 So. 2d 794, 798 (¶9) (Miss. Ct. App. 2006)).

¶22. Both the parties and the chancellor recognized that Robert's residence on the Mississippi Gulf Coast and Sarah's relocation out of state made the existing custodial schedule "unworkable." In his final judgment, the chancellor stated that he placed "greater emphasis on [Julia's] education than almost any other issue in this case." While acknowledging the difficulty in assigning responsibility for Julia's more than twenty school absences, the chancellor concluded that Sarah bore greater responsibility for the vast majority of Julia's tardies and that both the "tardies and absences contributed to [Julia] having to repeat kindergarten." The chancellor also placed great emphasis on the testimony from Matherne, Julia's kindergarten teacher, and Bertram, the dean of academics, who both indicated that Robert appeared to be the more involved and responsible parent with regard

11

to Julia's education.

¶23. Based on the witnesses and evidence, the chancellor reasoned that Robert should receive custody of Julia during the upcoming school year while Sarah should receive custody the majority of the summer holiday, the entirety of spring break and Thanksgiving, and part of Christmas. Because substantial credible evidence supports the chancellor's modification of the custodial schedule, and because the modification still served the purpose of providing both parties with "significant periods of physical custody to assure [the] child of frequent and continuing contact with both parents[,]" we find no manifest error in the chancellor's determination. *Gaddis*, 235 So. 3d at 1448-49 (¶7) (quoting Miss. Code Ann. § 93-5-24(5)(c) (Rev. 2013)).

## II. Admission of Witness Testimony

¶24. Sarah next asserts that the chancellor erroneously failed to strike Bertram's testimony based on a violation of Mississippi Rule of Evidence 615, the witness-sequestration rule. On the second day of the hearing, Bertram disclosed on cross-examination that she had spoken with Matherne after Matherne's testimony on the first day of the hearing. Matherne and Bertram each testified about their personal interactions with and observations of the parties and Julia during the prior school year. Following Bertram's disclosure that she had spoken to Matherne after Matherne testified, Sarah moved to strike Bertram's testimony due to a violation of Rule 615. On appeal, Sarah argues the chancellor abused his discretion by denying her motion to strike Bertram's testimony.

12

¶25.   We review a chancellor's admission or exclusion of evidence for abuse of discretion. *Heisinger*, 243 So. 3d at 259 (¶46). We are "limited to an abuse-of-discretion standard when reviewing an alleged sequestration violation." *Evans v. State*, 294 So. 3d 664, 666 (¶9) (Miss. Ct. App. 2020) (quoting *Johnson v. State*, 242 So. 3d 145, 163 (¶36) (Miss. Ct. App. 2017)). Rule 615 provides for the sequestration of trial witnesses and states that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." As we have previously explained:

> The purpose of Rule 615 is to exercise a restraint on witnesses tailoring their testimony to that of earlier witnesses and aid in detecting testimony that is less than candid. Simply put, Rule 615 guards against falsification, inaccuracy, and collusion. However, failure to comply with a sequestration order does not automatically render a witness's testimony inadmissible. Rather, the decision to exclude the witness's testimony rests within the trial court's sound discretion.

*Evans*, 294 So. 3d at 666-67 (¶10) (citations and internal quotation marks omitted). "Exclusion of . . . [a witness's] testimony is a serious sanction[] and [is] appropriate only where probable prejudice would result to the other party. The more appropriate sanction is to allow the other party full bore cross-examination of the witness on the facts of the Rule violation." *Harris v. State*, 937 So. 2d 474, 479 (¶16) (Miss. Ct. App. 2006) (citation and internal quotation marks omitted).

¶26.   Here, neither party listed Bertram as a witness in their original discovery responses, and Bertram had not yet been subpoenaed to appear for the hearing when Matherne testified on the first day of the hearing on July 17, 2018. Not until his supplemental discovery

13

responses provided on August 3, 2018, did Robert list Bertram as a witness for the second day of the hearing on August 6, 2018. After Sarah moved to strike Bertram's testimony on cross-examination, the chancellor considered the parties' arguments on the issue. The chancellor found that Bertram, in her administrative capacity as dean of academics, had a right to speak with her employee, Matherne, about what had transpired with regard to one of the school's students. As noted, Bertram did not receive a subpoena to appear at the hearing until over two weeks after Matherne's testimony. The chancellor further concluded that Bertram's testimony on direct examination had been based on her own personal knowledge of events regarding the prior school year rather than on any other witness's knowledge. In addition, the chancellor concluded that Sarah failed to demonstrate that Matherne and Bertram had collaborated with each other to provide similar testimony. Moreover, the chancellor found Sarah failed to establish that she had suffered any unfair prejudice as a result of Bertram's testimony.

¶27. Upon review, we find no evidence to suggest that Matherne and Bertram colluded or attempted to provide false or inaccurate testimony. Because the record supports the chancellor's determination that Sarah showed no unfair prejudice due to the admission of Bertram's testimony, we find no abuse of discretion in the chancellor's refusal to strike Bertram as a witness. We therefore find that this assignment of error lacks merit.

### III. Contempt

¶28. Sarah next challenges the chancellor's denial of her claim of contempt against Robert.

14

"Contempt matters are committed to the substantial discretion of the [chancellor]," and the chancellor's findings "will not be disturbed unless manifestly wrong." *Hunt v. Hunt*, 289 So. 3d 313, 317 (¶11) (Miss. Ct. App. 2019) (quoting *Gutierrez v. Gutierrez*, 153 So. 3d 703, 713 (¶31) (Miss. 2014)). "A contempt citation is proper only when the contemner has wilfully and deliberately ignored the order of the court." *Bozant v. Nguyen*, 296 So. 3d 254, 260 (¶10) (Miss. Ct. App. 2020) (quoting *Lewis v. Pagel*, 172 So. 3d 162, 178 (¶39) (Miss. 2015)). "Whether a party is in contempt is a question of fact to be decided on a case-by-case basis. A chancellor has substantial discretion in deciding contempt matters because of the chancellor's 'temporal and visual proximity' to the litigants." *Voss*, 242 So. 3d at 958-59 (¶25) (quoting *Gilliland v. Gilliland*, 984 So. 2d 364, 369-70 (¶19) (Miss. Ct. App. 2008)).

¶29. In her contempt petition, Sarah contended that Robert's failure to timely pay the marital home's mortgage had damaged her credit rating. At the hearing, Sarah reiterated these allegations but failed to submit a credit report or any other proof to support her claim of damages. The chancellor also found the evidence failed to establish that Robert's untimely remittance of the mortgage payments had been "willful and obstinate." Robert admitted that he had failed to timely remit one or two mortgage payments after the parties' divorce. Robert further acknowledged that he was solely responsible for paying the mortgage and that he should have made the payments. Robert testified, however, that he did not have the money to pay the missed mortgage payments. Although Robert knew Sarah was listed on the home's mortgage, he stated he did not realize the exact effect that missing the

15

payments would have on her credit.

¶30. The chancellor concluded that Robert's failure to timely remit the missed mortgage payments was not willful and that any adverse effect on Sarah's credit (which she had failed to establish) was unintentional. Robert and Sarah sold the marital home on December 4, 2017. Thus, by the time Sarah filed her contempt petition on December 15, 2017, no more outstanding mortgage payments remained. Based on the testimony and evidence before him, the chancellor declined to hold Robert in contempt. Because the record contains sufficient evidence to support the chancellor's denial of Sarah's contempt claim, and because we cannot say that the chancellor manifestly erred or abused his discretion, we find this issue lacks merit.

## IV. Monetary Judgment and Attorney's Fees

¶31. Sarah further asserts that the chancellor erred by failing to award her a monetary judgment and attorney's fees related to her contempt claim. "This Court will not disturb a chancellor's [decision regarding a] monetary award unless it is manifestly wrong [or] clearly erroneous, or if the chancellor applied an erroneous legal standard." *Hammons*, 289 So. 3d at 1221 (¶33). Likewise, "[t]he matter of awarding attorney's fees is largely entrusted to the sound discretion of the chancellor." *Heisinger*, 243 So. 3d at 259 (¶45) (quoting *Evans v. Evans*, 75 So. 3d 1083, 1089 (¶22) (Miss. Ct. App. 2011)). "An award of attorney's fees is not to be given to a party who is unsuccessful in an action she initiates." *Bryant v. Bryant*, 924 So. 2d 627, 633 (¶26) (Miss. Ct. App. 2006). Moreover, even where a litigant prevails,

16

she "must show something more" before she can "recover attorney's fees in most forms of litigation." *Id.* (quoting *Young v. Deaton*, 766 So. 2d 819, 822 (¶12) (Miss. Ct. App. 2000)).

¶32. Because we find no abuse of discretion or manifest error in the chancellor's denial of Sarah's contempt action against Robert, we also find no abuse of discretion in the chancellor's denial of Sarah's claims for a monetary judgment and attorney's fees related to the contempt action. Accordingly, this issue lacks merit.

## V. Robert's Post-Trial Motion

¶33. In her final assignment of error, Sarah contends the chancellor erred by failing to dismiss Robert's post-trial motion, which she claims purported to be a Rule 60 motion but was actually an untimely filed Rule 59(e) motion. Following the entry of the chancellor's final judgment on August 14, 2018, both parties filed post-trial motions. Robert's motion, filed on September 24, 2018, first responded to Sarah's August 24, 2018 post-trial motion and then moved "for clarification of [the] parties' continuing financial obligation" regarding certain expenses for Julia and "for clarification or correction of [the] judgment regarding travel for long[-]distance visitation." Nowhere in his motion did Robert cite either Rule 59 or Rule 60. On appeal, however, he asserts that his motion clearly fell under the purview of Rule 60(b)(6) and that the chancellor properly granted his requested relief under that subsection.

¶34. "Notwithstanding the style of a motion, if it challenges the correctness of a judgment and is timely made within ten days, it will be treated as one made under Rule 59(e)." *DeSoto*

17

*Cnty. v. Standard Constr. Co.*, 283 So. 3d 102, 106 (¶12) (Miss. 2019). Because Robert filed his post-trial motion outside the ten-day period provided by Rule 59(e), he sought relief from the chancellor's judgment under Rule 60. "Motions for relief under Rule 60 in general are addressed to the sound discretion of the trial court, and appellate review is limited to whether that discretion has been abused." *Mitchell v. Moore*, 237 So. 3d 681, 685 (¶26) (Miss. 2017). While "Rule 60(a) prescribes an efficient method for correcting clerical errors appearing in judgments, orders, or other parts of a trial record[,] errors of a more substantial nature must be corrected in accordance with [Rules] 59(e) or 60(b)." *Id.* at 686 (¶28) (quoting *Townsend v. Townsend*, 859 So. 2d 370, 375 (¶18) (Miss. 2003)).

¶35.    Rule 60(b) provides as follows:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(1)    fraud, misrepresentation, or other misconduct of an adverse party;

(2)    accident or mistake;

(3)    newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);

(4)    the judgment is void;

(5)    the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application;

(6)     any other reason justifying relief from the judgment.

> The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken.  A motion under this subdivision does not affect the finality of a judgment or suspend its operation.

Here, we find that Robert filed his post-trial motion "within a reasonable time" since he filed the combined response and motion forty-one days after the entry of the chancellor's final judgment.  *Id.*  The only remaining question, therefore, is whether the chancellor could properly grant Robert's requested relief under Rule 60(b)(6) as Robert contends on appeal.

¶36.    In discussing relief granted under Rule 60(b)(6), the Mississippi Supreme Court has stated the following:

> Rule 60(b)(6) is reserved for extraordinary and compelling circumstances.  The rule contains a catch-all provision, which has been referred to as a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses of Rule 60, or when it is uncertain that one or more of the preceding clauses afford relief.

*Mitchell*, 237 So. 3d at 689 (¶51) (citations and internal quotation marks omitted).

¶37.    As Robert's post-trial motion asserted, the chancellor's final judgment restructured the custodial schedule but failed to discuss whether the parties' responsibility regarding certain expenses for Julia, as established in the divorce judgment, had also been affected.  Specifically, Robert noted that the divorce judgment had required the parties to equally divide all Julia's educational expenses, including extracurricular activities and private-school tuition, and all "out[-]of[-]pocket medical expenses incurred for" Julia's benefit.  Because the chancellor's final judgment had not addressed the parties' continuing obligation to

19

equally divide these expenses, Robert, out of an abundance of caution, sought clarification that the chancellor's final judgment had not changed the parties' responsibility with regard to these designated expenses. In addition, the chancellor's final judgment omitted any specific guidance regarding the custodial exchange for Sarah's long-distance travel between Mississippi and North Carolina. Robert therefore also sought clarification as to the terms of the custodial exchange.

¶38. Upon review, we find no abuse of discretion in the chancellor's consideration of Robert's requested relief under Rule 60(b)(6). The chancellor viewed Robert's requested clarifications as "requests for more specific terms" regarding the custodial schedule and transportation. Because the chancellor's final judgment had omitted these terms, their inclusion in the November 26, 2018 order served simply to clarify the chancellor's prior judgment and to assist both parties as they navigated the modification to the custodial schedule. Despite Sarah's allegations, we find no abuse of discretion arising from the chancellor's failure to dismiss Robert's post-trial motion. We therefore find this argument lacks merit.

### CONCLUSION

¶39. Because we find that substantial credible evidence supports the chancellor's decision and that no manifest error or abuse of discretion occurred, we affirm the chancellor's judgment.

¶40. **AFFIRMED.**

20

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**